**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Lawrence Rollinger, Jr., individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>McDONALD'S CORPORATION; McDONALD'S USA, LLC; and DELOITTE CONSULTING LLP,<br><br>*Defendants.* | Case No. 1:26-cv-14329<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff Lawrence Rollinger, Jr. ("Plaintiff"), individually and on behalf of the Class defined below, brings this action against Defendants McDonald's Corporation and McDonald's USA, LLC (collectively, "McDonald's") and Deloitte Consulting LLP ("Deloitte," and together with McDonald's, "Defendants") for violations of Section 1 of the Sherman Act, 15 U.S.C. §1. Plaintiff's allegations are made upon personal knowledge as to himself and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of counsel.

## I. NATURE OF THE ACTION

1. Approximately 95% of the roughly 13,500 McDonald's restaurants across the United States are independently owned and run by franchisees, while the remaining 5% are operated by McDonald's corporate (referred to below as "McOpCo"). McDonald's plans to have 98% of its restaurant portfolio franchised by 2028. McDonald's has told investors that franchisees "maintain control over all employment related matters, marketing and pricing decisions," and has

likewise assured customers that franchisees "set menu prices for their restaurants."

2. In practice, however, the situation is quite different. Starting no later than 2019, McDonald's, its company-owned restaurants, and its franchisees have all set menu prices using a single shared tool that McDonald's controls (the "McDonald's Pricing System"). McDonald's has described this tool in various ways, including as its "menu pricing engine," its "pricing recommendation tool," its "Base Pricing Engine," and "a suite of proprietary pricing tools," while franchisees call it the "McDonald's Pricing Analyzer." Each competing franchisee restaurant submits its confidential transaction data to McDonald's, and the system combines that data from rival restaurants to generate price recommendations for every item at every restaurant, which are released in coordinated "pricing round[s]." The system was built by the consulting firm Deloitte together with McDonald's internal revenue growth management group.

3. McDonald's executives have described the Deloitte relationship to investors. Its CEO said that "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." A former CFO made a similar statement: "We use a third-party adviser that advises the franchisees as well as the company on pricing." A later CFO, at the time when price increases were at their steepest, reported that "we're still seeing very strong adherence with our franchisees to our pricing recommendations." The CEO also acknowledged that McDonald's had built the capability "to know exactly by item, by restaurant, the ability for us to take pricing."

4. Customers have absorbed the impact. U.S. prices at McDonald's have risen every year since 2019, by about 6% in 2021, 10% in 2022, and another 10% in 2023, and they have kept rising through 2024, 2025, and 2026. By McDonald's own calculation, its average menu item cost roughly 40% more in 2024 than in 2019. McDonald's has said that its pricing advisers' guidance, along with the supporting "data and analytical capability," allowed it to increase prices "in a way

that has minimized the resistance from the customer," and that "even though we're pushing through pricing, the consumer is tolerating it well." (Emphasis added).

5. Franchisees follow the recommendations from the McDonald's Pricing System because their businesses depend on compliance. Opening a McDonald's restaurant is estimated to cost between $1,471,000 and $2,728,000. Franchisees have "no right to renew" their licenses, and whether they can renew or expand depends on McDonald's assessment of them at periodic "Business Reviews," into which McDonald's has incorporated pricing compliance. Since January 2026, franchisees have been required to be "constructively engaging with McDonald's approved Pricing Consultant and Tools." McDonald's CEO has told investors that "pricing noncompliance" is now a consideration in Business Reviews affecting franchisees' "growth and eligibility" to continue operating or to expand.

6. It is ironic that McDonald's has itself objected to this kind of behavior. When McDonald's, as a buyer, paid inflated prices for pork, it sued its suppliers for sharing confidential data through a common intermediary, characterizing that arrangement as "the modern equivalent of the proverbial smoke-filled room." Compl. ¶3, McDonald's Corp., v. Agri Stats Inc., No. 0:22-cv-03106 (D. Minn. Nov. 25, 2022), ECF No. 1.

7. The McDonald's Pricing System has produced a horizontal conspiracy among competitors, namely the McOpCo-owned restaurants and each of the franchisees, to fix prices. An agreement among competitors to fix, raise, or stabilize prices is unlawful per se.

8. Plaintiff bought menu items from franchise McDonald's restaurants and paid more than he would have if those restaurants had set their prices independently. On behalf of himself and the Class, Plaintiff seeks treble damages and injunctive relief.

## II. PARTIES

### A. Plaintiff

9. Plaintiff Lawrence Rollinger, Jr. resides in Minnesota. During the Class Period, Plaintiff bought menu items from multiple McDonald's restaurants and, because of the conduct alleged herein, paid supracompetitive prices.

**B. Defendants**

10. Defendant McDonald's Corporation is incorporated in Delaware and headquartered in Chicago, Illinois. It is the parent company of McDonald's USA, LLC and of its subsidiaries that own the company-operated McDonald's restaurants in the United States (the "McOpCo" restaurants). The statements about the McDonald's Pricing System described in this Complaint were made by current or former McDonald's Corporation officers, including Chairman and Chief Executive Officer Christopher Kempczinski and Chief Financial Officers Kevin Ozan and Ian Borden. McDonald's Corporation also created a "revenue growth management function" that, on information and belief, seeks to increase profits by, among other things, coordinating pricing.

11. Defendant McDonald's USA, LLC is a Delaware limited liability company headquartered in Chicago, Illinois, and is wholly owned by McDonald's Corporation. McDonald's USA, LLC is the franchisor under the current U.S. franchise agreements; it issues the McDonald's Franchise Disclosure Document, administers the National Franchising Standards and Business Reviews, and charges franchisees a fee for "the use of the Base Pricing Engine." Accordingly, McDonald's USA, LLC, at a minimum, oversees and controls the McDonald's Pricing System and profits from the conspiracy alleged herein.

12. McDonald's sells menu items to consumers at McOpCo restaurants, which compete with franchised restaurants. McDonald's represents to investors that it makes 100% of investments in McOpCo restaurants, and receives 100% of operating profits from McOpCo restaurants. McDonald's thus is both the organizer of the conspiracy and a horizontal competitor of the franchisees that take part in it.

13. Defendant Deloitte Consulting LLP, a subsidiary of Deloitte LLP, is a Delaware limited liability partnership whose principal place of business is in New York, New York. Deloitte's pricing practice created the "Strategic Pricing Analyzer," which, on information and belief, is the same "McDonald's Pricing Analyzer" that franchisees use to review the recommendations generated by the McDonald's Pricing System.

14. Deloitte also employs and supervises "Pricing Advisors" who deliver pricing to restaurant clients. Within a "dedicated region," each Pricing Advisor acts as "the client's first point of contact to solve their pricing needs," relies on "a custom-built pricing optimization solution" to "make appropriate recommendations," and "[p]resent[s] pricing trends during regional client meetings (2-3x per year)." On information and belief, Deloitte's Pricing Advisors provide the McDonald's Pricing System's recommendations to competing McDonald's restaurants, and Deloitte is the "approved Pricing Consultant" with which McDonald's has, since January 2026, required franchisees to be "constructively engaging." Deloitte took part in the conspiracy alleged herein as an independent co-conspirator and not merely as McDonald's agent.

### C. Co-Conspirators

15. The co-conspirators include every McDonald's franchisee in the United States and the McOpCo subsidiaries. Each Defendant is jointly and severally liable for the acts its co-conspirators—whether or not those co-conspirators are named as defendants—took in furtherance of the conspiracy.

## III. JURISDICTION AND VENUE

16. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1337, as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26. Jurisdiction is also proper under 28 U.S.C. §1332(d), since the amount in controversy is greater than $5,000,000, not counting interest and costs, and at least one Class member is a citizen of a different State than at least one Defendant.

17. The Court may exercise personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. §22, and Federal Rule of Civil Procedure 4(k). McDonald's Corporation and McDonald's USA, LLC have their headquarters in this District. Deloitte maintains offices in this District and, on information and belief, drew on personnel here to staff, at least in part, its pricing engagement for McDonald's.

18. Venue in this District is appropriate under 15 U.S.C. §22 and 28 U.S.C. §1391(b) and (c), because Defendants conduct business and can be found here, and because a substantial portion of the events underlying Plaintiff's claims, including the operation and enforcement of the McDonald's Pricing System, occurred in this District.

19. Defendants' conduct substantially affected interstate commerce. McDonald's restaurants are located in every State and in the District of Columbia, and the McDonald's Pricing System produced prices for restaurants nationwide.

## IV. FACTUAL ALLEGATIONS

### A. McDonald's Intended for Its Restaurants to Compete as Independent Businesses

20. McDonald's receives a royalty of 4% or 5% of each franchised restaurant's gross sales, plus a share of rent and other fees, and it retains all of the sales from McOpCo restaurants. Consequently, McDonald's earns money directly from higher menu prices as long as customers keep buying menu items.

21. The McDonald's franchise agreements state that a franchisee "shall have no authority, express or implied, to act as agent of McDonald's" and "is, and shall remain, an independent contractor." The agreements also provide that the franchisee and McDonald's "are not and do not intend to be partners, associates, or joint employers in any way." Thus, Each franchisee is a separate business.

22. Franchisees are told that they will compete with one another and with McDonald's

itself. The franchise agreement grants no "exclusive grant, exclusive area, exclusive territorial rights, [or] protected territory," and warns that the franchisee "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control." McDonald's told the Federal Trade Commission in 2023 that it deliberately withholds exclusive territorial rights so that franchisees will face competition from other McDonald's restaurants.

23. McDonald's claims that menu pricing is solely the franchisee's decision. Its annual reports likewise claim that franchising permits an individual restaurant to "maintain control over all employment related matters, marketing and pricing decisions." The President of McDonald's USA echoed these statements.

24. McDonald's company-owned restaurants compete directly with its franchised restaurants. In earlier litigation against McDonald's, this Court found that "McDonald's franchisees and McOpCos within a locale are direct, horizontal, competitors." *Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *8 (N.D. Ill. June 25, 2018). The Seventh Circuit agreed. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (finding no poach clause to be a horizontal agreement).

25. Absent the conspiracy, each franchisee and each McOpCo restaurant would set its menu prices independently, considering factors such as its own costs and its own customers.

### B. McDonald's Pricing was Independent and Reflected Local Costs Before McDonald's Implemented its Pricing System

26. Before McDonald's created its Pricing System, each location set prices reflecting inflation and its own costs. In 2022, the head of investor relations for McDonalds's explained that pricing decisions from years prior had focused more on food-away-from-home and food-at-home inflation, and stated that those considerations aren't as responsible for influencing pricing

decisions in the current environment.

27. As recently as 2019, McDonald's U.S. price increases were generally aligned with its costs. In the first quarter of 2019, McDonald's reported U.S. pricing increased roughly 2% as compared with commodity cost increases of roughly 3%, while the third quarter of 2019 was similar—with prices rising approximately 3% while commodity costs rose roughly 2%. The CEO of McDonald's described 2019 the average amount spent per transaction, or check growth, as "heavily mix-driven," depending on the items ordered and reflecting a "pricing element" that also accounts for labor inflation and gets passed on to customers in the form of prices.

28. At that time, McDonald's pricing capabilities were decentralized and independent. At the company's 2026 Investor Day conference, McDonald's CEO explained that, before McDonald's implemented its Pricing System in 2019, "[b]usiness functions, including menu, restaurant design, pricing analytics, indirect procurement and consumer insights were all decentralized," and that McDonald's did not have a "revenue growth management function" where it could coordinate pricing, promotions, and product assortment to increase profits.

29. Starting around 2019, McDonald's significantly changed how it handled pricing with its franchisees. McDonald's itself even acknowledged in December 2023 that "[o]ver the last several years, we've significantly improved our pricing capabilities."

30. While McDonald's has been collecting restaurant-level transaction data for years prior to 2019, it did not have a pricing tool to coordinate pricing. It's 2017 Franchise Disclosure Document ("FDD") only stated that McDonald's had "independent access to your sales and other restaurant-level information" and required franchisees to provide monthly "individual restaurant profit and loss statement(s)," but made no mention of a pricing engine nor a charge for using a pricing tool. However, in its 2025 FDD, McDonald's disclosed that it had begun charging franchisees a fee for its Base Pricing Engine.

31. McDonald's franchisees began to form an owners' association in 2018. One third-generation franchisee warned others that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche," and that "[o]ur ability to price our menu boards may be one of the last controls we still have." George Michell, who was an owner/operator of 37 McDonald's restaurants, filed a lawsuit against McDonald's where he alleged that he and other McDonald's franchisees were forced to use Deloitte's McDonald's Pricing Analyzer to set prices since April 2019. This matches a Reuters report that McDonald's "has used some form of an AI pricing tool since at least 2019."

32. In February 2020, Deloitte announced that it was rolling out a restaurant pricing engine to several thousand stores of a leading restaurant chain. It claimed the pricing engine was "[d]eveloped with one of the world's leading restaurants," which, on information and belief, refers to McDonald's. Just one year later, Reuters reported that "[m]any McDonald's franchisees turn to consulting firm Deloitte for advice on how to set optimal pricing," and gave an example how Deloitte recommended a uniform price for McDonald's new spicy and crispy chicken sandwiches of $3.69.

33. McDonald's executives have repeatedly acknowledged its shift in pricing methodology. Statements in July 2021 claimed that "both we and our franchisees take a more consumer research-based approach than we would have several years ago." Later that year, in October, they admitted that "[b]oth we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." In July 2023, McDonald's acknowledged that it had created a tool with pricing "capabilities" with "our third-party advisers[.]" Finally, in April 2024, McDonald's executives acknowledged that "we've done a lot over the last several years building our pricing capabilities."

34. Plaintiff alleges that on information and belief and no later than 2019, McDonald's

company-owned and franchised restaurants entered into a conspiracy to set prices through the McDonald's Pricing System. That system takes pooled competitor data and generates pricing recommendations and was designed to set prices in lockstep fashion across competing restaurants, rather than reflecting each restaurant's independent assessment of its own costs and competitive position.

### C. The McDonald's Pricing System

#### 1. McDonald's Collects Confidential Sales and Pricing Data from Every Franchised and Company-Owned Restaurant

35. McDonald's franchisees are required to transmit their confidential sales data to the company. According to the 2025 FDD, transaction-level information produced by the restaurant's POS [Point of Sale] system, covering sales, transactions, and product mix, is kept on the franchisee's own server hardware, sent to McDonald's, and stored on McDonald's servers. The FDD adds that McDonald's can access this information independently and that no contractual restrictions limit its right to do so.

36. McDonald's can also view aggregated cashless and gift-card transaction data. In addition, franchisees are obligated to file monthly financial statements, including "individual restaurant profit and loss statement(s)," by way of McDonald's Franchisee Financial System.

37. McDonald's maintains records of every competing restaurant's nonpublic prices, product mix, costs, unit sales, and profit margins. On information and belief, franchisees do not normally have access to their competitors' nonpublic transaction data, and the McDonald's Pricing System is the channel through which each restaurant's nonpublic data affects the prices charged by its competitors.

#### 2. McDonald's Directs the Use of McDonald's Pricing System

38. McDonald's created its Pricing System to be a tool through which McDonald's and its franchisees can set prices. Over the years, it has gone by a variety of names. Franchisees know

it as the "McDonald's Pricing Analyzer," whereas McDonald's has described it as "a suite of proprietary pricing tools," its "Base Pricing Engine," its "approved Pricing Consultant and Tools," its "menu pricing engine," and its "pricing recommendation tool." On information and belief, all of these names point to the same pricing tool under McDonald's control (hereinafter referred to as the "McDonald's Pricing System"), or to later versions of that tool.

39. Franchisees were already setting retail prices using Deloitte's "McDonald's Pricing Analyzer" by April 2019. McDonald's continued working on this issue and in 2023, reported that it had assembled "a talented internal team" to support its pricing tools. By 2026, McDonald's had established its own "revenue growth management function," meaning McDonald's itself had gained the expertise required to coordinate pricing, promotions, and product assortment in order to continue to grow its profits. Two former employees claim that McDonald's pricing engine is currently run by Tiger Analytics, and that McDonald's sets the engine's rules and corporate targets, that is, objectives set by McDonald's shape the engine's pricing recommendations.

40. There is no public source of information that explains how the work performed by Deloitte, Tiger Analytics, and McDonald's internal team has been allocated or ordered. On information and belief, Deloitte and Tiger Analytics have each built or operated McDonald's Pricing System and have coordinated with McDonald's in doing so.

41. Deloitte's public statements have acknowledged that it created a restaurant pricing engine that corresponds to the implementation of McDonald's Pricing System. Deloitte was promoting a "Strategic Pricing Analyzer" for restaurants in February 2020, which it claimed had been "developed with one of the world's leading restaurants." Deloitte's description indicated that the tool used artificial intelligence and machine learning to merge store-level sales, price, and cost data with economic and competitive data; applied business rules provided by the restaurant; delivered recommendations via an online portal where restaurant managers log in; matched menu

prices to what customers were willing to pay; and was backed by in-market pricing advisors. Deloitte reported deploying the tool across several thousand stores of a leading restaurant chain, and it was offered compensation tied to a percentage of the incremental profit the tool produced. On information and belief, that restaurant chain is McDonald's, and the tool Deloitte described is the "McDonald's Pricing Analyzer." As Figure 1 shows, the Pricing Analyzer's login page, titled "Pricing Analyzer" and prompting users to "Log in to review pricing recommendations and performance," shows both the McDonald's Golden Arches logo and the Deloitte name.

**FIGURE 1: Login Page of the McDonald's "Pricing Analyzer"**




42. McDonald's maintains central control over the McDonald's Pricing System. In August 2026, McDonald's CEO told investors that McDonald's was "close to having all our major markets on . . . one pricing engine[.]" And at its September 2026 Investor Day conference, he went on to explain that McDonald's had in fact restructured various functions that had been previously decentralized in order to create "one McDonald's way of operating," built upon "a single enterprise data foundation." This included a "pricing analytics" function. McDonald's further claimed that

its "menu pricing engine" was "an industry-leading tool that provides franchisees with pricing recommendations down to the restaurant and item level," which were "[i]nformed by insights from millions of transactions and a broad range of market data."

43. McDonald's 2022 Form 10-K claimed that "The Company has demonstrated an ability to manage . . . cost increases effectively through its rapid inventory turnover, ability to adjust menu prices, cost controls and substantial property holdings, many of which are at fixed costs." In addition, McDonald's stated in its earnings reports filed with the SEC in 2025 and 2026 that "we believe our ability to compete successfully in the current market environment depends on our ability to . . . price our products appropriately."

44. The centralized nature of pricing is further shown by the fact that, in 2026, McDonald's was recruiting for a Senior Director of Revenue Growth Management Solution Delivery, whose responsibilities included "establish[ing] and execute[ing] the enterprise roadmap for RGM capabilities, including menu pricing."

45. McDonald's USA Chief Restaurant Officer wrote in a December 2025 memo to U.S. franchisees that McDonald's is reinforcing "individual accountability for value leadership – equipping you with approved pricing consultants, tools, and other levels of support."

46. As of January 1, 2026, McDonald's formally required all of its restaurants to use the McDonald's Pricing System. McDonald's now requires franchisees to be "constructively engaging with McDonald's approved Pricing Consultant and Tools," and it assesses franchisees' pricing during Business Reviews. Under McDonald's New Term Policy, those reviews help determine whether a franchisee receives a new franchise term when its 20-year term expires and whether it may acquire additional restaurants. As a practical matter, use of the McDonald's Pricing System is mandatory.

**3. McDonald's Company-Owned Restaurants and Its Franchised**

**Competitors Are All Price Using the McDonald's Pricing System**

47. McDonald's executives have confirmed on numerous occasions that its company-owned restaurants and the franchised restaurants that compete with them all set menu prices using McDonald's Pricing System. CEO Christopher Kempczinski has admitted that "[b]oth we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." Former CFO Kevin Ozan stated that franchisees are "advised by a third party, and the pricing mechanism or methodology that's used is a consumer-based research approach." He went on to state that McDonald's tries to "take small increments of pricing at various times," and also stated that McDonald's "work[s] closely with our franchisees on pricing. We use a third-party adviser that advises the franchisees as well as the company on pricing." Ian Borden, McDonald's CFO, also admitted that McDonald's works with "third-party advisers . . . who make recommendations to our business, including our franchisees, on how we price."

48. McDonald's treats the pricing recommendations of the McDonald's Pricing System as its own. McDonald's CFO in October 2022 referred to "our pricing recommendations." When discussing the U.S. business in October 2023, he talked about McDonald's advisers "who obviously make pricing recommendations to our business, including our franchisees." McDonald's Head of Investor Relations similarly acknowledged that McDonalds' uses "a third party for . . . pricing recommendations."

49. McDonald's invests in and directs the use of McDonald's Pricing System. In January 2023, McDonald's CFO touted "the investments we've made over the last couple of years to really improve the tools, the data and the analytics that our advisers use to provide recommendations to the business."

**4. McDonald's Pricing System Sets Competing Restaurant Prices Using Pooled Competitor Data**

50. The McDonald's Pricing System utilizes data pooled from competing restaurants. McDonald's CEO reported to its investors that as more customers participate in McDonald's digital ecosystem, "our pricing tools get sharper, our AI models get smarter." Reuters reported that McDonald's Pricing System analyzes data from millions of daily transactions across McDonald's restaurants to determine the optimal price for each item at each location.

51. McDonald's establishes the corporate targets and rules that impact the McDonald's Pricing System's recommendations for each competing restaurant. Former employees from Tiger Analytics have reported that Pricing System rules are focused on raising the prices for items whose prices have not increased in at least two years.

52. The McDonald's Pricing System also determines how much of a price increase each restaurant's customers will tolerate. In a competitive market, the prices of nearby competing McDonald's restaurants would decrease that tolerance. But because the system sets competitors' prices using the same pooled data, the tolerance it measures reflects the lack of competition. Reuters has reported that each restaurant's price sensitivity is displayed in the franchisee interface, which is based in part on what McDonald's Pricing System determines that customers in the restaurant's area are willing to pay. McDonald's CEO acknowledged as much when he stated that McDonald's studies pass-through rates (the portion of a price increase that will result in higher sales rather than lost customers) "to make sure that we understand the consumer's willingness to accept any pricing."

53. Figure 2 illustrates the McDonald's Pricing System as alleged herein.

**FIGURE 2: How McDonald's Pricing System Works**




54. McDonald's is aware that its Pricing System may run afoul of the antitrust laws. Reuters has published screenshots showing that the terms of service warn franchisees that they "may be competitors of each other," and that "it is particularly important for all Users of the Tool to understand and comply fully with anti-trust and competition laws." The terms also purport to claim that franchisees are "always free to determine the final price," but in reality, this disclaimer is contradicted by McDonald's monitoring and enforcement actions.

**D. The Franchisee-Facing Layer of the McDonald's Pricing System is Operated by Deloitte**

55. Deloitte participated to a far greater extent in this scheme than merely licensing software to McDonald's. Its "Pricing Advisors" have acted as McDonald's "first point of contact to solve their pricing needs," they have maintained their client relationships within a "dedicated region," drawn on their "custom-built pricing optimization solution" to "make appropriate

recommendations," modified their "pricing recommendations for the client" to account for "local market events," and "[p]resent pricing trends during regional client meetings (2-3x per year)."

56. Deloitte has used Pricing Advisors to advise McDonald's on pricing since the McDonald's Pricing System began. For example, Deloitte advertised a Chicago opening for a pricing analyst position in May 2024, to "[s]upport[ ] a premier client in the fast food restaurant industry," with the same responsibilities, including presenting pricing trends at regional client meetings two to three times a year. On information and belief, the "premier client" was McDonald's.

57. The Pricing Advisors at Deloitte provide McDonald's Pricing System recommendations to competing McDonald's restaurants. Deloitte holds "regional client meetings" to bring together franchisees who compete with one another in the same region, where the same Pricing Adviser then provides them with the same guidance and pricing recommendations. Deloitte was fully aware that the restaurants it advised were competitors. Deloitte even included a warning in the pricing portal's terms of service that its users "may be competitors of each other."

58. In the antitrust lawsuit McDonald's brought against pork processors, McDonald's itself acknowledged that the detailed competitor pricing information that was shared through the Agri Stats platform "is not the type of information that competitors would provide each other in a normal, competitive market." Compl. ¶3, *McDonald's Corp., v. Agri Stats Inc.*, No. 0:22-cv-03106 (D. Minn. Nov. 25, 2022). McDonald's went on to allege that "in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to their competitors would be to their disadvantage – unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other." *Id*. at ¶50.

59. On information and belief, McDonald's tied Deloitte's compensation for its pricing

advisory services to the increased profit the pricing tool generated, which provided Deloitte with a financial incentive to drive prices higher. Additional evidence of Deloitte's participation in implementing the McDonald's Pricing System is that in December 2019, after the tool had been widely adopted, Deloitte's former CEO, Catherine Englebert, was elected to the McDonald's Board of Directors.

60. By providing each competing restaurant with pricing recommendations derived from those competitors' pooled data, and by convening competing restaurants to provide them with shared pricing trends, Deloitte knowingly joined and furthered the conspiracy.

**E. McDonald's Coordinates Price Increases With Franchisees By Issuing Frequent "Pricing Rounds"**

61. McDonald's pushes price increases through its franchise system in coordinated rounds. In March 2022, the company's CFO said, "We generally will take smaller, more frequent increases than less frequent large increases." In June 2022, McDonald's Head of Investor Relations described the process, stating that "it takes us probably 6 to 8 weeks to get a good read on how a pricing round goes before we can decide what we might do next."

62. Franchisees then implement these pricing recommendations. McDonald's CFO reported to its investors in October 2022—when increases were at their highest—that McDonald's was "still seeing very strong adherence with our franchisees to our pricing recommendations."

63. McDonald's CEO likewise told investors in January 2023 that "[o]ngoing communication with our franchisees regarding the magnitude and pace of pricing will remain essential" and that "our franchisees have been great about the pace of pricing." Just a few months later, in April 2023, he boasted that McDonald's had "built a very good capability over the last several years working with some external partners to know exactly by item, by restaurant, the ability for us to take pricing. And what we see is that when we follow that . . . we're able to get

the pricing that we need through." He also provided a warning to McDonald's franchisees when he stated that "we need to stay very disciplined on pricing." On the same call, McDonald's CFO praised "the discipline that both our owner/operators and our company restaurants are bringing" to pricing.

64. In December 2023, McDonald's stated to its investors:

> When we follow our pricing tools, our ability to price at a level that the consumer will accept is significantly better than when we don't, which maximizes the flow-through rate of our price increases to sales. Franchisees see the value in this and adoption rates for our pricing strategy are high.

**F. McDonald's Has Increased Its Prices Every Year Since 2019**

65. McDonald's own financial reports demonstrate that its U.S. prices have risen in every year since McDonald's began utilizing its Pricing System. In 2019, McDonald's reported U.S. pricing "up about 2%" in the first quarter and "up nearly 3%" in the third quarter. From 2020 through the second quarter of 2021, U.S. pricing was up roughly 6% year-over-year, "[m]ost of [which] was pricing that was taken over the last year." For all of 2021, U.S. pricing rose "a little over 6%." In 2022, U.S. pricing was up "roughly 8%" in the first quarter, "just over 10%" in the third quarter, and "about 10%" for the full year. In 2023, U.S. pricing increased by "low double-digit level[s]" in the second quarter and "just around 10%" for the full year.

66. The increases continued into 2024, when McDonald's projected U.S. pricing in line with "low single-digit inflation" and described its U.S. pricing in early-2024 as "carryover pricing." McDonald's also reported that 2024 U.S. comparable sales "benefit[ed] from average check growth, partly offset by negative comparable guest counts." McDonald's reported a U.S. menu price increase of "just under mid-single digit" in the first quarter of 2025; boasted that combo meals "could be priced over $10" by mid-year; and admitted that its 2025 U.S. comparable sales "benefit[ed] from average check growth," meaning the increase in average prices per transaction.

In the first quarter of 2026, McDonald's reported that comparable sales were "primarily driven by positive check growth," again referring to an increase in the average amount spent per transaction, and, in the second quarter, reported "a fairly significant amount of price that got taken."

67. These increases compounded. Tallying McDonald's reported annual menu price increases for 2021 through 2023 alone yields a cumulative price increase of roughly 28%. McDonald's reported that its average menu prices in 2024 were about 40% higher than in 2019. Figure 3 shows how each year's increase was layered on top of the one before.

**FIGURE 3: Cumulative Increase in McDonald's U.S. Menu Prices, 2021–2023**




68. McDonald's own data shows price increases throughout its menu. McDonald's website shows that between 2019 and 2024, the average price of medium fries went up by 44%, a 10-piece McNuggets meal increased by 28%, and a Big Mac meal increased by 27%. Even though these increases were substantial, McDonald's attempted to point to particular menu items in an attempt to counter claims that its prices had doubled. McDonald's acknowledged, however, that across its full menu, average prices rose about 40% from 2019 to 2024, as compared to only a 29%

increase in the Consumer Price Index for food away from home over the same period. Figure 4 illustrates the difference.

**FIGURE 4: McDonald's Average Menu Price Increase vs. Food-Away-From-Home Inflation, 2019 to 2024**




69. Looking back even farther, from 2014-2024 average menu prices have risen between 39% and 100%, increases that outplace inflation during the same time period.

70. McDonald's credited its "strategic menu price increases" for growth in U.S. comparable sales during this period. It also attributed the staying power of those increases to the McDonald's Pricing System, not simply to rising costs. McDonald's reported that roughly 70% to 80% of its U.S. price increases continued to flow through to sales, even as it increased its U.S. prices by roughly 6% in 2021 and about 8% in early 2022. Speaking about its U.S. business, McDonald's CFO pointed to "the data and analytical capability that comes from our third-party advisers who obviously make pricing recommendations to our business, including our franchisees," as what enabled McDonald's to implement increases "in a way that has minimized the resistance from the customer and maximize[d] the flow-through that we're getting as a result of those price increases." Even though McDonald's ascribed the price levels themselves to "elevated cost and inflationary pressures" and reiterated its claim that franchisees make their own

pricing decisions, McDonald's gave its pricing advisers' capability the credit for gaining customers' acceptance of the higher prices.

71. McDonald's CEO claimed that since "there is no substitute for a Big Mac," this "gives us pricing ability," and touted McDonald's "tremendous pricing tools" for "guid[ing] us well[.]"

72. McDonald's price increases have never been reversed. While the frequency of price increases may have eased after 2023, McDonald's continued to raise its prices. In August 2025, McDonald's CEO admitted that customers were still "seeing combo meals could be priced over $10[.]" The value items that McDonald's currently offers, which includes Extra Value Meals, are in reality priced as discounts from the menu item prices that rose every year since 2019 through at least 2025. To this day, customers continue to pay the elevated prices set through the McDonald's Pricing System.

**G. McDonald's Monitors Pricing and Enforces Franchisee Compliance**

73. McDonald's has attempted to hide this conspiracy by publicly telling investors that "we give pricing recommendations, but ultimately, it's up to the franchisees as to whether they adopt those pricing recommendations." But the truth is that McDonald's knows when a restaurant strays from its pricing recommendations and keeps track of it. Because McDonald's supplies each restaurant's recommended prices and receives each restaurant's transaction-level data, including the prices actually charged, it can identify, and on information and belief does identify, every time a restaurant prices an item differently than what is recommended. Reuters, which reviewed a June 2026 franchisee document, reported that the franchisee document demonstrates that McDonald's tracks franchisees' deviations from its recommendations in detail.

74. Since introducing the McDonald's Pricing System in 2019, McDonald's has used Deloitte's Pricing Advisors as a means of enforcing compliance with McDonald's pricing

recommendations. The Pricing Advisors presented the system's recommendations to franchisees at periodic meetings. McDonald's ownership of McOpCo restaurants provides a further incentive to compel franchisees to comply, because in a genuinely competitive market, McOpCo restaurants would not adopt a recommended price increase if a franchisee-owned restaurant declined to do the same, since the franchisee's lower prices would draw customers away from the McOpCo restaurant. It is therefore in McDonald's own interest to enforce the compliance of its franchisees.

75. When discussing McDonald's Every Day Affordable Price ("EDAP") value menu in August 2026, McDonald's CEO stated that "we provide recommended guidance to our franchisees. So we're quite clear in terms of what we believe is the right pricing execution." Five franchisees explained to Reuters that McDonald's had pressured them into using the McDonald's Pricing Tool. One former franchise owner reported that corporate officers would call franchisees when they did not follow the recommendations, and said in regard to pricing that "[y]ou don't really have much of a choice anymore."

76. McDonald's ties this compliance to each franchisee's future as a licensed seller of McDonald's products. The franchise agreement requires adherence to McDonald's standards and policies as "the essence of this Franchise," demands "strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified," and requires franchisees to "comply with all business policies, practices, and procedures imposed by McDonald's." On information and belief, McDonald's counts adherence to the McDonald's Pricing System's recommendations among those standards and policies, as its January 2026 requirement that franchisees be "constructively engaging with McDonald's approved Pricing Consultant and Tools" confirms.

77. Franchisees have "no right to renew or extend" their franchises. McDonald's assesses each franchisee "throughout the franchise term" at "each Business Review" against its

National Franchising Standards, and a franchisee that has not consistently met those standards is likely to be denied a new term. A franchisee that wants to acquire additional restaurants must meet every National Franchising Standard and "support McDonald's Values and initiatives." McDonald's reserves the right to "apply, modify or eliminate" these standards "as it deems appropriate." Franchisees have a lot to lose with noncompliance: the approximate initial investment a franchisee puts into a McDonald's restaurant runs between $1,471,000 and $2,728,000.

78. Pricing has become an increasingly important part of McDonald's franchisee Business Review. In December 2025, McDonald's reported that starting January 1, 2026, it would "holistically assess the outcomes" of franchisees' pricing decisions made with "the Third-Party Pricing Advisors." The January 2026 standards require franchisees to be "constructively engaging with McDonald's approved Pricing Consultant and Tools." When speaking about franchisees that had not followed McDonald's EDAP pricing guidance in August 2026, McDonald's CEO explained that "as we're now doing our business reviews with franchisees, which affects things like growth and eligibility . . . pricing and pricing noncompliance in certain cases [are] part of those conversations," and that franchisees' comparative performance and Business Reviews "will be the things that get this fixed." Whichever direction a particular recommendation points, it is McDonald's, and *not* the independent franchisee, that determines the "right pricing execution," and franchisees that depart from it will be forced to answer for doing so in their Business Reviews.

79. Stated more plainly, McDonald's relies on Deloitte's Pricing Advisors and its own Business Reviews to align franchisees' prices with McDonald's own pricing decisions, and the consequences for franchisees that deviate from those pricing decisions include McDonald's refusing to renew their franchise licenses.

**H. Competing Restaurants Coordinate Directly With Each Other**

80. Competing McDonald's restaurants come together and make joint decisions through a range of forums. The Operator's National Advertising Fund ("OPNAD"), a national advertising cooperative, along with local cooperatives are organizations made up of McDonald's franchisees; McOpCo restaurants are voting members, and OPNAD members elect regional representatives that have "operating and decision making powers." McDonald's, which created OPNAD, supplies it with marketing and legal personnel at no charge. While participation in OPNAD is allegedly voluntary, McDonald's gauges each franchisee's compliance with its "Operator Involvement standard," one of its National Franchising Standards, partly on the basis of the franchisee's "consistent involvement with OPNAD and local cooperatives."

81. McDonald's also endorses a set of national franchisee organizations, including the National Franchisee Leadership Alliance ("NFLA"), which claims to be the elected representative voice of McDonald's franchisee organizations across the United States. Another independent group, the National Owners Association ("NOA"), likewise represents McDonald's franchisees. McDonald's further gathers franchisees, suppliers, and employees at its worldwide convention.

82. Deloitte also meets with competing McDonald's restaurants. On information and belief, Deloitte's Pricing Advisors provide guidance and pricing trends to franchisees at regional meetings, which are held two to three times per year. These meetings provide competing McDonald's restaurants in each region a recurring venue at which to meet and receive common pricing information and discuss pricing.

83. Through the McDonald's Pricing System, combined with these direct opportunities to conspire and adding McDonald's own enforcement mechanisms, competing McDonald's restaurants conspired to raise prices and align the menu board prices that are shown to customers. For example, in 2024, McDonald's announced that "93% of our restaurants in the U.S. have committed to extending" a $5 meal deal. In 2025, the Chair of the NFLA described McDonald's

nationally advertised $5 and $8 Extra Value Meals as a sign of "the company and franchisees' shared commitment." Again in 2026, McDonald's claimed there was "unanimous alignment through the franchisee field votes" in favor of a value menu with nationally advertised prices.

84. McDonald's and its franchisees jointly manage any price increases. In July 2024, McDonald's CEO acknowledged that "[a]s we absorb these cost increases in partnership with our franchisees, we look for ways to protect restaurant profitability via productivity efforts and selective price increases," and in November 2026 said, "[W]e're always in conversations with franchisees around pricing."

85. McDonald's hosts franchisees at its headquarters for discussions on pricing. As the McDonald's CEO admitted, "We've actually had leadership franchisees at headquarters this week talking about that exact thing."

86. In addition, McDonald's brings franchisees, suppliers, and employees together at its worldwide convention every two years. The last convention was held in Las Vegas, NV in 2026.

87. These statements show that competing McDonald's restaurants have not only the means, but the practice of setting prices collectively, which contradicts McDonald's assertion that each franchisee sets its prices independently.

### I. McDonald's Pricing System Is Not Included in any Legitimate Agreement

88. The franchise agreements nowhere mention the McDonald's Pricing System. Instead, by their own terms, the "essence" of McDonald's franchise agreements is to promote consistent product and service quality, including "serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service and Cleanliness in the Restaurant operation."

89. In fact, McDonald's 2025 Franchise Disclosure Statement described McDonald's "base" pricing engine as an "optional fee" for franchisees. The reality for franchisees, of course, differed from what McDonald's represented in that statement. Still, it shows that the McDonald's Pricing System was not necessary to accomplish the goals of the franchise agreements.

90. McDonald's continued emphasis on franchisee independence in pricing matters in its public statements is further evidence that the McDonald's Pricing System is not ancillary to its franchise agreements.

91. Furthermore, establishing uniform prices through the McDonald's Pricing System is unrelated to any procompetitive goal of the franchise agreements. McDonald's own public statements confirm this: executives have credited McDonald's revenue growth since 2020 not to greater output or better products, but to "pushing through pricing [that] the consumer is tolerating [] well."

**J. McDonald's and its Co-Defendants Have Concealed the Conspiracy**

92. McDonald's continually represents that franchisees set their own prices independently, including in its annual reports and on investor calls. In April 2024, for instance, when discussing franchisees' financial position, McDonald's CEO Christopher Kempczinski told investors, "As you know, they control pricing." And in May 2024, the President of McDonald's USA told customers that it was the franchisees who set menu prices, and attributed price increases to increased costs to run their businesses.

93. McDonald's has not publicly disclosed how its Pricing System actually operated: it did not disclose that its algorithm was based on pooled transaction-level data taken from competing McDonald's restaurants, that McDonald's was responsible for supplying the rules and targets which shaped each competing restaurant's recommendations, or that McDonald's meticulously tracked each franchisee's compliance with those recommendations. McDonald's

annual reports also do not discuss the McDonald's Pricing System, its data inputs, rules, or the monitoring of franchisee compliance.

94. After Reuters published a report on the pricing engine on September 29, 2026, McDonald's issued a statement in which it denied that its Pricing Tools set prices and reaffirmed its claim that its franchisees independently set the menu prices at each of their restaurants. One McDonald's executive went so far as to claim that Reuters had gotten the story wrong.

95. Before the Reuters story, the features of the McDonald's Pricing System—such as its pooled data inputs, its rules, and its monitoring of compliance—had not been disclosed publicly. Plaintiff would not have been able to discover the conspiracy by exercising reasonable diligence before September 29, 2026.

96. Defendants have fraudulently concealed the conspiracy, which has tolled any applicable limitations period. In addition, each sale at a supracompetitive price is considered to be a new overt act that restarts the limitations period for that sale.

**K. Regulators' Interest in Enforcing Antitrust Laws**

97. In other similar actions filed in this District, the U.S. Department of Justice has filed a Statement of Interest in the case and has taken the position that competitors' use of a shared pricing algorithm to set benchmark or starting-point prices can constitute concerted action under Section 1 even where the competitors do not always adhere to the algorithm, but that the exchange of competitively sensitive information through an intermediary can violate the antitrust laws. *See, e.g.*, Statement of Interest of the United States, *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795, MDL No. 3121 (N.D. Ill. Mar. 27, 2025), ECF No. 382; Statement of Interest of the United States, *In re Frozen Potato Prods. Antitrust Litig.*, No. 1:24-cv-11801 (N.D. Ill. Feb. 27, 2026), ECF No. 266.

98. Furthermore, three U.S. Senators wrote to the McDonald's CEO in October 2024,

inquiring whether McDonald's price increases had outpaced inflation and requested information about McDonald's pricing decisions, including how McDonald's decides prices for individual menu items, how often it reevaluates prices, and whether McDonald's "provide[s] guidelines to franchisees regarding pricing decisions." McDonald's publicly responded that the letter "demonstrates a lack of understanding of our franchise business model" and blamed its price increases on rising costs.

99. In November 2026, a U.S. Senator and four members of the U.S. House of Representatives wrote to the McDonald's CEO, expressing their concern "that McDonald's may be using AI to squeeze consumers into paying higher prices, and that its AI pricing tools may facilitate collusion between franchisees who should be operating as competitors." In addition, the letter requests that McDonald's response to sixteen questions about the McDonald's Pricing System, including:

- "Do McDonald's pricing tools use, directly or indirectly, pricing or transaction data from more than one McDonald's location when generating a pricing recommendation for an individual restaurant? If so, please explain how that information is incorporated."
- "Please describe all steps McDonald's takes to encourage, incentivize, pressure, or require franchisees to use its approved pricing tools or follow their recommendations, including any communications concerning pricing non-compliance."
- "Has a franchisee's decision not to use McDonald's pricing tools or follow their recommendations ever been considered in decisions concerning franchise renewal, approval of new locations, financial assistance, restaurant modernization, or other benefits or penalties for franchise owners? If so, please provide the number of

instances and relevant documentation."

- "What antitrust review did McDonald's conduct before deploying its pricing tools to independently owned franchisees? Please identify when those reviews occurred and whether McDonald's has subsequently evaluated whether its tools could facilitate coordination, reduce pricing independence, or produce higher or more uniform prices among competing restaurants."

McDonald's has yet to publicly respond to this letter.

## V. EVIDENCE OF AN AGREEMENT TO SET PRICES

### A. Direct Evidence

100. McDonald's franchise agreements and policies are an express agreement between McDonald's and each franchisee. Under the franchise agreement and policies, each franchisee sends its nonpublic transaction data to McDonald's, engages with McDonald's approved pricing consultant and tools, and complies with every policy McDonald's imposes, pricing policies included. A franchisee that does not do so risks having its franchise denied a renewal.

101. McDonald's has publicly admitted that it and its franchisees rely on the same third-party adviser, that McDonald's issues "our pricing recommendations" in various "pricing round[s]," and that franchisees show "very strong adherence" to these recommendations. These statements are direct evidence that competing restaurants agreed to hand pricing decisions over to the McDonald's Pricing System and to follow its recommendations.

102. Through OPNAD and local cooperatives, franchisees agreed to implement nationally advertised price points for menu items. Together, the "unanimous alignment through the franchisee field votes" and system-wide efforts to set pricing on core menu items "as an entire system," these commitments are direct evidence that competing McDonald's restaurants agreed to collectively set their prices.

### B. Each Restaurant Understood It Was Participating in a System-Wide Agreement

103. This conspiracy does not depend on each restaurant's separate dealings with McDonald's. Every McDonald's restaurant understood that its competitors priced their menu items using the same mandatory system, that the recommendations it received were built in part on its competitors' data, and that any departures from the recommended prices were tracked and enforced by McDonald's. Each also acted together with other restaurants in setting prices.

104. McDonald's informed its investors that "[b]oth we and our franchisees" use the same third-party pricing adviser. The Franchise Disclosure Document, which every franchisee receives and signs, discloses the fee for "the use of the Base Pricing Engine." In addition, the pricing portal's own terms of service warned every user that the other users "may be competitors of each other."

105. Also, as observed in the 2026 letter from several members of Congress, "McDonald's recognizes the antitrust risks posed by its AI pricing tool in the pricing tool's terms of service, where it warns that 'it is particularly important for all Users of the Tool to understand and comply fully with anti-trust and competition laws,' while directing franchisees to consult their own attorneys for additional guidance." And, former FTC Commissioner William Kovacic noted that the language in the terms of service is "an acknowledgment there's a potential [antitrust] problem."

106. McDonald's monitored compliance by franchisees. Deloitte's Pricing Advisors meet with franchisees on a regular basis to encourage broader adoption of McDonald's pricing recommendations. McDonald's keeps detailed records of each franchisee's departures from those recommendations, and corporate officers phone franchisees to admonish them when they deviate from them. Beginning in 2026, "pricing noncompliance" has been a factor that McDonald's

considered in the Business Reviews that impacts franchisees' "growth and eligibility."

107. Use of the pricing system is compulsory. Since January 2026, McDonald's national franchising standards have required every franchisee to be "constructively engaging with McDonald's approved Pricing Consultant and Tools," and McDonald's evaluates the outcomes of every franchisee's pricing decisions.

108. Through McDonald's advertising cooperatives, franchisees make pricing decisions collectively when they vote on nationally advertised price points. In 2025, the franchisees "voted to extend" advertising of a $2.99 price point, and McDonald's described developing pricing solutions of this kind "as an entire system."

109. Franchisees recognized and knew that control over pricing was moving away from individual restaurants and toward a common pricing system. As early as 2018, a third-generation McDonald's franchise owner named Blake Casper worked with other franchisees to form the NOA. He warned that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche."

**C. Parallel Conduct**

**1. Adoption of McDonald's Pricing System**

110. Beginning in or around 2019, McDonald's franchisees and its company-owned restaurants abandoned independent restaurant pricing and adopted the McDonald's Pricing System. By April 2019, Deloitte's "McDonald's Pricing Analyzer" was the mechanism that franchisees used to set their prices. By 2021, McDonald's announced that "both we and our franchisees" had been using the same third-party adviser which took "a more consumer research-based approach than we would have several years ago."

111. Franchisee use of the McDonald's Pricing System was high and increasing. In 2022, McDonald's reported "very strong adherence" to its pricing recommendations, and by 2023

it reported "high" adoption rates of its pricing strategy. By 2026, McDonald's outright required every one of its franchisees to utilize its approved pricing consultant and tools.

112. McDonald's 2017 Franchise Disclosure Document identified no such pricing tool or requirement to using McDonald's pricing consultant, but by 2026 it was mandatory. This is evidence of the sharp break from McDonald's past practice in allowing independent pricing by its franchisees.

### 2. McDonald's Restaurants Raised Prices in Parallel

113. After adopting the McDonald's Pricing System, McDonald's restaurants raised their prices in parallel. McDonald's reported its yearly U.S. price increases as single, system-wide numbers (roughly 6% in 2021 and roughly 10% in both 2022 and 2023), which reflected increases applied across company-owned and franchised restaurants alike.

114. The increases were coordinated. McDonald's implemented "smaller, more frequent increases" in system-wide "pricing round[s]," evaluated each round before it could "decide what we might do next," and raised prices a "few times a year."

115. The increases reached across the entire menu. Between 2019 and 2024, average prices for McDonald's core items climbed between 20% and 44%, and the average menu item became roughly 40% more expensive.

116. Company-owned and franchised restaurants moved together on pricing. McDonald's CFO commended "the discipline that both our owner/operators and our company restaurants are bringing" to pricing.

117. Once the McDonald's Pricing System was in place, the rate of increases rose sharply, from about 2% to 3% in 2019, to about 6% in 2021, and then to about 10% in both 2022 and 2023.

## D. Antitrust Plus Factors

118. Several plus factors indicate that Defendants' parallel conduct resulted from an agreement rather than from independent decision-making.

### 1. Exchange of Competitively Sensitive Information

119. Each restaurant supplied its detailed, current nonpublic transaction data to a common hub, which used the pooled information to produce its competitors' recommended prices. An independent business would not allow its confidential data to be used by its competitors to set their prices unless it expected those competitors to do the same.

### 2. Allowing a Common Agent to Set Pricing is Contrary to Unilateral Self-Interest

120. Every McDonald's restaurant handed its pricing decisions to a common agent. Rather than setting prices according to its own costs, customers, and competitive judgment, each restaurant priced according to recommendations produced by the same engine, from the same pooled data, under rules McDonald's provided for every competing McDonald's restaurant. An independent competitor would not give its pricing to the same decision-maker that sets its competitors' prices unless it expected its competitors to do likewise.

121. In a competitive market, a restaurant observing double-digit price increases at nearby McDonald's restaurants would have reason to underprice them and win over their customers. The McDonald's structure was intended to have franchisees compete with other nearby McDonald's restaurants. But instead, McDonald's restaurants adhered to these common recommendations with "very strong adherence."

122. Restaurants continued to raise prices even as guest counts fell. In 2024, McDonald's reported that U.S. comparable sales benefited from average check growth, even though such growth was "partly offset by negative comparable guest counts." The decline in the number of customers has continued: Reuters reported that U.S. foot traffic at McDonald's

restaurants dropped year over year in every complete month from March through August 2026. But in a competitive market, shrinking customer counts should lead to lower prices, not higher ones. But even with declining customers, Figure 5 shows that McDonald's U.S. operating income actually rose 43%, from $4.07 billion in 2019 to $5.81 billion in 2025.

**FIGURE 5: McDonald's U.S. Operating Income, 2019–2025**




123. Each franchisee also accepted oversight of whether it followed the recommendations. McDonald's keeps track of every franchisee's departure from its pricing recommendations, and "pricing noncompliance" is a component of the Business Reviews that decide franchisees' "growth and eligibility." An independent business would not agree to be policed on whether it adheres to prices drawn from its competitors' data unless that arrangement applied to its competitors too.

### 3. Market Conditions Are Favorable for Collusion

124. The market for McDonald's menu items has various features that make it easy to implement coordinated pricing, and to monitor and maintain the agreement.

125. **Inelastic demand**. Because customers accept McDonald's price increases with little loss of sales, coordinated price increases are profitable. McDonald's acknowledged that it continued to see "flow-through of 70% to 80% of those price increases." Its CEO reported to its investors that "even though we're pushing through pricing, the consumer is tolerating it well," and credited McDonald's "ability to actually push through the pricing" to its brand: "there is no substitute for a Big Mac."

126. **Homogeneous products**. McDonald's restaurants provide a uniform offering of standardized products. This homogeneity makes coordination easy to carry out and monitor. And via the use of the McDonald's Pricing System, McDonald's can monitor every restaurant's prices on a daily basis.

#### 4. Defendants Had Many Opportunities to Collude

127. Representatives of competing McDonald's restaurants regularly meet through organizations such as OPNAD, local cooperatives, franchisee field votes, other McDonald's-endorsed franchisee organizations, McDonald's Worldwide Convention, and its Business Reviews.

## VI. RELEVANT MARKET AND MARKET POWER

128. Defendants' conduct amounts to a horizontal price-fixing conspiracy, which is unlawful *per se*, so Plaintiff need not show market power or anticompetitive effects. *Deslandes*, 81 F.4th at 703. Plaintiff nonetheless alleges the relevant markets below, because Defendants' conduct is also unlawful under the rule of reason.

129. Defendants' ability to raise prices every year from 2019 through 2026, including by roughly 10% per year in 2022 and 2023, is direct evidence of their market power.

130. To the extent Plaintiffs must define a relevant product market, it is the sale of meals and menu items to consumers by quick-service hamburger restaurants (the "QSR Hamburger

Market"). Quick-service hamburger restaurants, such as McDonald's, Burger King, and Wendy's, provide low-priced, hamburger-focused menus with fast service and counter, drive-through, and mobile ordering. Consumers do not consider full-service restaurants, fast-casual restaurants, other categories of quick-service restaurants, or food bought at grocery stores to be reasonable substitutes for quick-service hamburger meals. McDonald's itself assesses competition by food category, reporting to investors that it leads "by a wide margin in beef with more than 40% share in a $50 billion category." In addition, the McDonald's Pricing System takes in the menu prices of nearby Wendy's and Burger King restaurants, which reflects McDonald's own view of which competitors limit its restaurants' prices.

131. The relevant geographic market is the United States. The McDonald's Pricing System generates recommendations centrally for restaurants nationwide, using an algorithm which draws on data pooled from restaurants across the country. McDonald's provides pricing guidance to all U.S. franchisees at the same time, and it enforces its pricing via its national franchising standards. McDonald's reports its U.S. pricing as a single system-wide figure and uses nationwide franchisee votes to set nationally advertised price points.

132. Customers across the United States buy the same menu items under the same conditions. Every McDonald's restaurant is required to serve "only designated food and beverage products" under the "uniform operation of all McDonald's restaurants." McDonald's promotes its products and prices to customers nationwide using national advertising campaigns. McDonald's ran a national advertising campaign in 2024 and 2025, where it promoted its $5 Meal Deal and $5 and $8 Extra Value Meals to customers. Whatever McDonald's restaurant a customer buys from, they find the same menu, the same nationally advertised prices, and prices produced by the same McDonald's Pricing System. The conspiracy's effects on price are therefore national in scope.

133. In the alternative, the relevant geographic markets are the Metropolitan Statistical

Areas ("MSAs") in which McDonald's restaurants are located. Customers buy from McDonald's restaurants close to where they live, work, and travel, and they choose among the restaurants in that area when they want McDonald's menu items. McDonald's conveys to prospective franchisees that "customers typically patronize various McDonald's restaurants depending on their travel patterns" and that other McDonald's restaurants "may have an effect on the sales of your McDonald's restaurant."

134. Convenience and proximity typically determine the area within which customers search for alternatives. Roughly 95% of U.S. McDonald's restaurants have drive-thru windows. MSAs estimate the areas in which customers make these choices, since the federal government defines each MSA around an urban core and the surrounding counties linked to it by commuting.

135. McDonald's itself analyzes pricing at both the national level and more local levels. Within each MSA, the McDonald's Pricing System produced recommendations for every McDonald's restaurant using the same rules and the same pooled data.

## VII. ANTITRUST INJURY

136. Plaintiff and members of the putative Class have antitrust standing. Class members who bought from McOpCo restaurants bought directly from Defendants, and Class members who bought from franchised restaurants purchased directly from McDonald's franchisees, each of which is a co-conspirator that used the McDonald's Pricing System, transmitted its transaction data to McDonald's and received the system's pricing recommendations, and is bound by McDonald's National Franchising Standards.

137. Defendants' conspiracy removed independent price competition among McDonald's restaurants. Without the conspiracy, each restaurant would have set its menu prices on its own, and competition among and between company-owned and franchised McDonald's restaurants, which McDonald's itself designed its system to create, would have held those prices in check.

138. Instead, the McDonald's Pricing System artificially pushed up prices at every restaurant that followed its recommendations. Because the system generated recommendations for every menu item

at every restaurant using the same rules and the same pooled data, the resulting overcharges reached purchasers throughout the United States, across all menu items, for the entire Class Period.

139. The conspiracy also reduced the competitive pressure that would have otherwise constrained each restaurant's prices. Since the same system produced recommendations for every competing McDonald's restaurant from the same pooled data, every restaurant could raise prices with less risk of being undercut by competition from nearby McDonald's restaurants.

140. The overcharges have persisted. The price increases carried out by using McDonald's Pricing System have not been reversed, and McDonald's current value offers are merely discounts from already elevated prices.

141. Plaintiff and members of the Class bought menu items either directly from Defendants or from their co-conspirators and therefore paid supracompetitive prices. They are the first purchasers from members of the conspiracy and the parties most directly harmed by it.

142. Paying inflated prices for menu items due to an agreement among competitors to restrain price competition is exactly the type of injury the antitrust laws were meant to protect against, and Defendants' conduct is therefore unlawful.

143. The overcharges can be measured across the entire class using common evidence, including the McDonald's Pricing System's recommendations and the restaurant-level transaction data that McDonald's collects for every restaurant.

## VIII. CLASS ACTION ALLEGATIONS

144. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following class (the "Class"):

> All persons and entities in the United States who purchased one or more menu items from a McDonald's restaurant in the United States, whether operated by McDonald's or by a franchisee, from January 1, 2019, until the effects of Defendants' conduct cease (the "Class Period").

145. Excluded from the Class are Defendants, all McDonald's franchisees, their officers and directors, and any judicial officer assigned to this case, together with that officer's immediate

family and staff.

146. *Numerosity.* The Class comprises many millions of members, making joinder impracticable.

147. *Commonality and Predominance.* Questions common to the Class predominate over any individual questions, including: (a) whether Defendants and their co-conspirators agreed to fix, raise, maintain, or stabilize menu prices through the McDonald's Pricing System; (b) whether Defendants exchanged competitively sensitive information through the McDonald's Pricing System; (c) whether the conduct raised prices for McDonald's menu items; (d) the measure of class-wide damages; and (g) the appropriate injunctive relief.

148. *Typicality.* Plaintiff's claims arise from the same conduct, and rest on the same legal theories, as the claims of all Class members.

149. *Adequacy.* Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in antitrust class actions.

150. *Superiority.* A class action is superior to other available methods of adjudication because individual damages are small relative to the cost of litigating complex antitrust claims.

151. *Injunctive Relief.* Defendants have acted on grounds generally applicable to the Class, making injunctive relief appropriate for the Class as a whole.

## IX. COUNT I—VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1 (PRICE FIXING)

152. Plaintiff repeats and incorporates by reference each of the preceding allegations as though fully set forth herein.

153. From no later than 2019 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at McDonald's restaurants in the United States.

154. The conspiracy consisted of an agreement among competing McDonald's restaurants—both company-owned and franchised—that was organized and enforced by McDonald's, to delegate pricing to the McDonald's Pricing System, feed that system their nonpublic transaction data, receive restaurant-level price recommendations generated from their competitors' pooled data, and adhere to those recommendations.

155. In furtherance of the conspiracy, Defendants and their co-conspirators, among other things: (a) sent nonpublic transaction data to McDonald's for use in the McDonald's Pricing System; (b) received and implemented restaurant-level and item-level price recommendations in coordinated pricing rounds; (c) applied McDonald's rules and corporate targets to generate recommendations for competing restaurants; (d) monitored compliance and recorded deviations from pricing recommendations; (e) made pricing compliance a part of Business Reviews affecting renewal and growth; and (f) agreed to nationally advertised price points through cooperatives and field votes.

156. The conspiracy is a horizontal agreement among competitors to fix prices and is unlawful per se. McDonald's participates both as the conspiracy's organizer and, through its McOpCo restaurants, as a competitor of the franchisee co-conspirators.

157. Alternatively, the conspiracy is unlawful under a quick-look analysis, because its anticompetitive effect on prices is obvious, or under the rule of reason. The conspiracy produced substantial anticompetitive effects, including higher prices and the elimination of independent price competition among McDonald's restaurants, and Defendants possess market power as alleged above.

158. The conspiracy is not reasonably necessary to achieve any legitimate procompetitive objective. Any procompetitive justification could be achieved through substantially less restrictive means, including pricing tools that do not use competitors' nonpublic

data and are not tied to renewal or growth.

159. Each Defendant knowingly participated in the conspiracy and is jointly and severally liable for the overcharges it caused.

160. As a direct and proximate result of the conspiracy, Plaintiff and the Class members paid supracompetitive prices and were injured in their business or property. They are entitled to treble damages, costs, and attorneys' fees pursuant to 15 U.S.C. §15.

161. Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, equitable relief, and damages.

## X. COUNT II—VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1 (INFORMATION EXCHANGE)

162. Plaintiff repeats and incorporates by reference each of the preceding allegations as though fully set forth herein.

163. Defendants and their co-conspirators agreed to exchange competitively sensitive information through the McDonald's Pricing System and to use that information to generate each restaurant's prices.

164. The information exchanged was current, granular, and nonpublic. It encompassed each restaurant's transaction-level sales, prices, and product mix, as well as monthly restaurant-level profit and loss statements. None of that information was available to consumers or to the public.

165. The information was exchanged among horizontal competitors. By McDonald's own design, its company-owned restaurants and franchised restaurants compete with one another for the same customers.

166. The exchange was continuous and centralized. Every restaurant's transaction data flows to McDonald's, and the McDonald's Pricing System uses the pooled data to produce

restaurant-level and item-level price recommendations for competing restaurants.

167. McDonald's menu items have an inelastic demand curve. McDonald's can raise the prices of its menu items without a significant decrease in demand or causing customers to switch their fast food purchases to another restaurant in the QSR Hamburger Market.

168. The structure of the market makes the information exchange particularly likely to harm competition. McDonald's restaurants sell standardized products under a uniform system, and McDonald's monitors compliance and enforces it through renewal and growth decisions.

169. The exchange is unlawful under the rule of reason. It actually reduced price competition and raised prices, and it served no legitimate procompetitive purpose that could not have been achieved through less restrictive means.

170. As a direct and proximate result, Plaintiff and the Class members paid supracompetitive prices and are entitled to treble damages, costs, attorneys' fees, and injunctive relief pursuant to 15 U.S.C. §§15 and 26.

171. Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, equitable relief, and damages.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants and grant the following relief:

A. an order certifying the Class under Rule 23, appointing Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

B. a declaration that Defendants' conduct violates Section 1 of the Sherman Act;

C. an award to Plaintiff and the Class of damages in an amount to be determined at trial, trebled;

D. a permanent injunction prohibiting Defendants from: (i) using the nonpublic data

of any franchisee or McOpCo restaurant to generate pricing recommendations for competing restaurants; (ii) monitoring franchisees' adherence to pricing recommendations, or considering pricing compliance in Business Reviews or in renewal or growth decisions; and (iii) entering into any similar arrangement;

E. an award of pre- and post-judgment interest;

F. an award of attorneys' fees and costs; and

G. such other relief as the Court deems just.

## XII. JURY DEMAND

172. Plaintiff demands a trial by jury on all issues so triable.

Dated: November 17, 2026

Respectfully submitted,

REINHARDT WENDORF & BLANCHFIELD

/s/ *Brant D. Penney*
Brant D. Penney
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (651) 287-2100
Email: b.penney@rwblawfirm.com

GUIN & EVANS, LLC

/s/ *Charles R. Watkins*
Charles R. Watkins
805 Lake Street, #226
Oak Park, IL 60301
Tel: (312) 878-8391
Email: cwatkins@guinevans.com

*Attorneys for Plaintiff and the Proposed Class*